Michael J. Ross
ROSS LAW OFFICE
9999 SW Wilshire St, Suite 101
Portland, Oregon 97225
(503) 222-7915

[Additional Captions on Signature Page]

*Attorney for Plaintiff Brian Morris*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| BRIAN MORRIS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ELECTRO SCIENTIFIC INDUSTRIES, INC., RICHARD H. WILLS, MICHAEL D. BURGER, FREDERICK A. BALL, LYNNE J. CAMP, LAURENCE E. CRAMER, and RAYMOND A. LINK,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Brian Morris ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Electro Scientific Industries, Inc. ("ESI" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with ESI, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") of ESI and MKS Instruments, Inc. ("MKS").

2.      On October 29, 2018, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which ESI shareholders will receive $30.00 in cash for each share of ESI common stock they hold (the "Merger Consideration").

3.      On November 19, 2018, in order to convince ESI shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Proxy Statement on Schedule 14A (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby rendering certain statements in the Proxy false and/or misleading.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

5.     In particular, the Proxy contains materially incomplete and misleading information concerning ESI's financial projections, which were developed by the Company's management and relied on by the Board to recommend the Proposed Transaction.

6.     It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for contraventions of: (i) Rule 14a-9; and (ii) Regulation G, 17 C.F.R. § 244.100, in violation of Sections 14(a) and 20(a) of the Exchange Act.  Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to ESI shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

10.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because ESI is headquartered in this District.

## PARTIES

11.    Plaintiff is, and at all relevant times has been, an ESI shareholder.

12.    Defendant ESI is an Oregon corporation and maintains its principal executive offices at 13900 N.W. Science Park Drive, Portland, Oregon.  ESI's common stock is traded on the NASDAQ GS under the ticker symbol "ESIO."

13.    Individual Defendant Richard H. Wills is the current Chairman of the Board and has served as a director of the Company since 2014.

14.    Individual Defendant Michael D. Burger has served as president and Chief Executive Office since 2016 and is a director of the Company.

15.    Individual Defendant Frederick A. Ball has been a director of the Company since 2003.

16.    Individual Defendant Lynne J. Camp has been a director of the Company since 2017.

17.    Individual Defendant Laurence E. Cramer has been a director of the Company since 2015.

18.    Individual Defendant Raymond A. Link has been a director of the Company since 2015.

19.    The Individual Defendants and ESI may collectively be referred to as "Defendants."  Each of the Individual Defendants herein is sued individually as well as in his or her capacity as an officer and/or trustee of the Company, and the liability of each arises from the

fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of ESI (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

21.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. According to the Proxy, as of November 16, 2018, there were approximately 34,309,352 shares of ESI common stock outstanding, held by hundreds to thousands of individuals and entities throughout the country. The actual number of public shareholders of ESI will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP[1] financial measures without a presentation and reconciliation of those measure to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

---

[1]     The acronym "GAAP" stands for Generally Accepted Accounting Principles.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

        ii)     whether the omission of the GAAP financial measures violates Section 14(a) of the Exchange Act;

        iii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

        iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading statements in the Proxy.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

## SUBSTANTIVE ALLEGATIONS

22.    According to public information, ESI supplies laser-based microfabrication solutions for the microtechnology industry worldwide. The Company provides printed circuit board laser drilling products, including laser via drilling systems for electrical interconnect applications that require dimensions to create electrical connections between layers in flexible circuits, high-density circuit boards, and interconnect packages; micro via drilling technology that addresses the changing applications in interconnect packages, multichip modules, and high density interconnect circuit boards; and ultraviolet laser processing systems that employ technology in lasers, optics, and motion control. The Company also offers semiconductor manufacturing products comprising wafer marking equipment for use in serialization and wafer identification; wafer and circuit trim tools that adjust the electrical performance of semiconductor devices or hybrid circuits; and memory yield improvement systems and related laser upgrades. In addition, the Company provides component test products that combine high-speed small parts handling technology with real-time control systems to provide inspection solutions for manufacturers of multilayer ceramic capacitors and other passive components, such as capacitor arrays, inductors, resistors, varistors, and hybrid circuits.  Further, it offers industrial machining products, such as platforms for precision drilling, scribing, cutting, etching, routing, and marking various materials and devices; and laser systems to manufacturers of end devices for drilling, marking, and cutting. The Company sells its products through direct sales and service offices, value-added resellers, and independent representatives

23.    The Company disclosed in the Proxy that while the focus has been to grow the Company on an independent basis, the Board has remained open to the possibility of selling the Company.  Proxy 30.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

24.     In March 2018, ESI management refreshed the Company's 2017 strategic plan financial forecasts.  *Id.*  This March refresh consisted of updating ESI's financial forecasts for fiscal year 2018 and fiscal year 2021, but did not include forecasts for fiscal years 2019 and 2020.  *Id.*  The Board decided in July 2018 that management should also include financial forecasts for the years 2019 and 2020.  *Id.* at 31.

25.     Beginning on May 7, 2018, the Company engaged in discussions with MKS on ways to collaborate and those discussion eventually led to the Board agreeing to the Proposed Transaction.  *Id.* at 30-31.  The Company's financial forecasts for fiscal years 2019 through 2021 were considered by the Board during the sales process with MKS and also provided to MKS during this process.  *Id.* at 31.

26.     In July 2018, the Board began to consider engaging Stifel, Nicolaus & Company ("Stifel") to assist in the sales process and to render a fairness opinion to the Board on any merger transaction the Board considered.  *Id.* at 31.

27.     On August 16, 2018, before Stifel had been engaged to act as financial advisor, undisclosed independent members of the Board instructed ESI's management to prepare a summary of ESI's long-term financial forecasts with additional detail on the assumptions underlying management's forecasts, as well as an upside scenario and a downside scenario of such financial forecasts to facilitate the Board's understanding of management's forecasts.  *Id*. at 32.  These more detailed long-term forecasts and the assumptions underlying them were reviewed by the Board on August 26, 2018.  *Id*. at 33.  Although the Proxy claims that the more detailed long-term forecasts were created for Stifel to incorporate into its financial analysis, Stifel had not been engaged as of August 16 and as of September 12, 2018, Stifel did not have access to the long-term financial forecast.  *Id*. at 34.  During this time, the Board was considering

these long-term more detailed financial forecasts. *Id.* at 33-34. Stifel later was provided access to the long-term financial forecasts to perform a Discounted Cash Flow Analysis that was reviewed with the Board on September 14, 2018. *Id.* at 34. As of the September 14, 2018 Board meeting, there was a pending "best and final" offer from MKS to acquire the Company at $31.75 in cash per share. *Id.* at 33.

28.    On October 9, 2018, after reviewing the Company's financials, MKS reduced its offer price from $31.75 per share in cash to $30.00 per share in cash due to less confidence regarding ESI's near-term growth rate. *Id.* at 35.

29.    On October 12, 2018 at a Board meeting, the Board, in order to consider MKS's reduced offer, discussed ESI's growth forecasts and valuation and decided to accept the MKS reduced offer and to negotiate additional terms of an agreement. *Id.* at 35-36. During the negotiations of the agreement terms, the Board continued to review and consider the Company's financial results. *Id.* at 36. As disclosed in the Proxy, "Members of ESI's management then provided the Board of Directors with an update on ESI's financial results, which the Board of Directors discussed. The Board of Directors determined that the recent financial results of ESI did not alter the Board of Directors' view of ESI's fiscal year or long-term outlook as an independent company, or its belief that the revised offer from MKS continued to represent a compelling opportunity for ESI's shareholders in comparison thereto." *Id.* Thus, the Board was reviewing financial information that was not the same as was provided to Stifel.

30.    The final terms of the Merger Agreement were negotiated and the Board voted to approve the Proposed Transaction on October 29, 2018.

31.    On October 30, 2018, the ESI and MKS announced the Proposed Transaction in a press release which states, in pertinent part:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

ANDOVER, Mass., Oct. 30, 2018 (GLOBE NEWSWIRE) -- MKS Instruments, Inc. (NASDAQ:**MKSI**) ("MKS"), a global provider of technologies that enable advanced processes and improve productivity, and Electro Scientific Industries, Inc. (NASDAQ:**ESIO**) ("ESI"), an innovator in laser-based manufacturing solutions for the micro-machining industry, today announced that they have entered into an agreement for MKS to acquire ESI for $30.00 per share. The all-cash transaction is valued at approximately $1 billion.

The combined company is expected to have approximately $2.2 billion in pro forma annual revenue, based on the two companies' calendar 2017 historical results. The transaction is expected to be accretive to MKS' Non-GAAP net earnings and free cash flow during the first 12 months post-closing. The combined company expects to realize $15 million in annualized cost synergies within 18 to 36 months.

"We believe the ESI acquisition will help us deliver on one of our long-term strategic objectives, which is to broaden our base as a technical solutions provider to additional customers and markets." said MKS CEO Gerald Colella.

"We anticipate that the addition of ESI will strengthen our expertise in the photonics and optics markets, enabling us to develop systems that provide rich and robust solutions to meet the challenges of evolving technology needs. We expect to further progress our philosophy of "Solve Together. Succeed Together" by bringing the best technologies and high quality, reliable solutions in partnership with our customers, as we have demonstrated with the Newport acquisition."

MKS anticipates the acquisition will further advance the MKS strategy to enhance our *Surround the Workpiece*$^{SM}$ offerings by adding extraordinary systems expertise and deep technical understanding of laser materials processing interactions. ESI's leadership in Printed Circuit Board processing systems and other capabilities will provide MKS the opportunity to accelerate the roadmaps and performance of our laser, motion, and photonics portfolio. In addition, ESI brings a new platform of industrial markets enabling MKS to leverage its expertise more broadly.

"We believe this combination will provide significant value for ESI's customers, as well as create exciting opportunities for our employees," said Michael Burger, President and Chief Executive Officer of ESI.

"Over the years, MKS' solutions have helped us improve our offerings for the Printed Circuit Board processing market. I anticipate that the continued close collaboration and expertise of these two outstanding companies will create even better and more valuable solutions for our customers."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

MKS intends to fund the transaction with a combination of available cash on hand and up to $650 million in committed term loan debt financing. On a pro forma basis, as if the transaction closed on June 30, 2018, we expect the combined company to have a strong balance sheet with combined pro forma net cash and investments of approximately $400 million and total term loan debt outstanding of $1 billion. This would result in pro forma trailing twelve month leverage, defined as debt to Adjusted EBITDA of 1.3 times and pro forma net leverage of 0.8 times. Actual leverage ratios will depend upon a number of factors and shall be determined at the time of the closing. The company has also obtained a commitment to upsize its asset based revolving credit facility to $100 million.

The transaction has been unanimously approved by the MKS and ESI boards of directors and is subject to customary closing conditions, including regulatory approvals and approval by ESI's shareholders, and is expected to close in the first quarter of 2019.

**The Materially Incomplete and Misleading Proxy**

32.     On November 19, 2018, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits both required and material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *The Materiality of Financial Projections*

33.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction. Here, the financial forecasts were relied on to approve the Merger Agreement and recommend the Proposed Transaction to shareholders as the Proxy discloses that the financial forecasts were prepared by the Company's management and that the Board

recommended the Proposed Transaction based in part on the "Board of Directors' evaluation of ESI's historical financial performance as well as its projected stand-alone financial performance embodied in the Management Forecasts." Proxy 39.

34.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101). Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions. In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K. *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

35.    Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format." 17 C.F.R. § 229.10(b). Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." 17 C.F.R. § 229.10(b)(2).

36.    In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial*

*results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

37.    Here, ESI's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in making its recommendation that shareholders vote in favor of the Proposed Transaction, the Board specifically relied on "projected stand-alone financial performance embodied in the Management Forecasts." Proxy 39.

38.    As discussed further below, the non-GAAP financial projections here do not provide ESI's shareholders with a materially complete understanding of the assumptions and key factors considered in developing Management Forecasts, which assumptions, factors and other inputs the Board reviewed.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

*The Financial Projections are Materially Incomplete*

39.     The Proxy discloses that three sets of financial forecasts were created: the "Base Forecasts," the "Upside Forecasts," the "Downside Forecasts," and collectively are referred to as the "Management Forecasts."  Proxy 47.  The Proxy discloses that the Board concluded that the Company was "significantly less likely" to achieve either the Upside or the Downside Forecasts. *Id.*

40.     Stifel made use of only certain forecasted non-GAAP financial measures from the Base Forecast, which were extended to 2022 and 2023 for Stifel only.  *Id.*

41.     The Proxy falsely claims that the Base Forecasts are included in the Proxy because they were made available to Stifel and MKS.  *Id.*  That is incorrect because the Proxy discloses that the Board relied on the Management Forecasts, separate and apart from Stifel's use of any particular financial forecasts, to recommend the Proposed Transaction, which are comprised of the Base Forecasts, the Downside Forecasts and the Upside Forecasts.  *Id.* at 39.

42.     With respect to Management's Forecasts, the Proxy fails to provide material information.

43.     The Base Forecast Revenue figure for FY 2021 figure is identified as $506.6 million, but it also disclosed that management projected FY 2021 Revenue at $516, $507 and $500 million based on the same underlying assumptions but with differences based on forecasted percentages of market share, forecasted revenue on a product-by-product base or "mere rounding."  *Id.* at 48-49 & n.2.  The Proxy fails to disclose the forecasted percentages of market share, forecasted revenue on a product-by-product base or "mere rounding" that underly the four different forecasted FY 2022 Revenue.

44.     Additionally, for each of the three forecast scenarios that make up the

Management Forecasts, the Proxy provides, *inter alia*, forecasted values for non-GAAP Gross Profit, non-GAAP Operating Income, EBITDA, non-GAAP Net Income and Unlevered Free Cash Flows. ("UFCF") (*id.* at 48) but fails to provide the line items used in their respective calculation or a reconciliation of these non-GAAP measures to their respective most comparable GAAP measures.

45.    Non-GAAP Gross Profit was "[c]alculated in a manner consistent with the calculation of gross profit under GAAP, but excluding charges for certain stock compensation expenses associated with employees in support of the delivery and sale of ESI's products" without disclosing the stock compensation charges. *Id.* at 49 n.3 (Base Forecasts), n.1 (Upside Forecasts), n.1 (Downside Forecasts).

46.    Non-GAAP Operating Income was "[c]alculated in a manner consistent with the calculation of operating income under GAAP, but excluding charges for stock compensation expenses and amortization expenses of intangible assets" without disclosing the stock compensation and amortization expenses for intangible assets. *Id.* at 49 n.4 (Base Forecasts), n.2 (Upside Forecasts), n.2 (Downside Forecasts).

47.    EBITDA was calculated by starting with GAAP operating income and excluding "charges for stock compensation expenses, amortization expenses of intangible assets and depreciation expenses[,]" but the Proxy fails to disclose the GAAP operating income starting point, the stock compensation expenses, amortization expenses of intangible assets and depreciation expenses. *Id.* at 49 n.5 (Base Forecasts), n.3 (Upside Forecasts), n.3 (Downside Forecasts).

48.    Non-GAAP Net Income was calculated in a manner "consistent" with the calculation of GAAP Net Income but excluding "charges for stock compensation expenses and

amortization expenses of intangible assets[,]" but the Proxy fails to disclose GAAP Net Income and the stock compensation charges and amortization expenses for intangible assets. *Id.* at 49 n.6 (Base Forecasts), n.4 (Upside Forecasts), n.4 (Downside Forecasts).

49.    UFCF is forecasted only for the Base Forecasts and is defined as a "non-GAAP financial measure calculated from EBITDA, less stock-based compensation expense, cash tax expense, capital expenditures and investment in net working capital expenses[,]" but the Proxy fails to disclose stock-based compensation expense, cash tax expense, capital expenditures and investment in net working capital expenses. *Id.* at 49 n.7.

50.    Thus, the Proxy's disclosure of these non-GAAP financial forecast provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon as it is clear that those line items were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

51.    The Management Forecasts disclosed on pages 48-49 of the Proxy violate Section 14(a) of the Exchange Act because the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G because Defendants failed to reconcile those non-GAAP measure to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs to calculate the non-GAAP measure and violates SEC Regulation 14a-9 because they are materially misleading as shareholders are unable to discern the veracity of the financial projections. As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

15

### *The Financial Projections Violate Regulation G*

52.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[2] and adopted Regulation G[3] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[4]

53.     Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures      . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[5]

54.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[6]  Former SEC Chairwoman Mary Jo White has stated that the

---

[2]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[3]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[4]     United States Securities and Exchange Commission, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (2002), *available at* https://www.sec.gov/rules/final/33-8176.htm (last visited November 28, 2018) ("SEC, *Final Rule*").

[5]     SEC, *Final Rule.*

[6]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/ (last visited November 28, 2018); Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as ESI included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[7]

55.    The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions. *Compare Youku Tudou Inc., et al.*, Correspondence 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[8] with *Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-

---

*available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0 (last visited November 28, 2018).
[7]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted) (last visited November 28, 2018).
[8]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm (last visited November 28, 2018).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

A and is thus not excepted from Rule 100 of Regulation G.");[9] *see Harbin Electric, Inc.*, Correspondence 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[10]

56.    Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9

57.    In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP measures and their respective most comparable GAAP

---

[9]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf (last visited November 28, 2018)

[10]    *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm (last visited November 28, 2018).  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G.").  *Available at* https://www.sec.gov/Archives/edgar/data/907687/000000000001 0060087/filename1.pdf (last visited November 28, 2018).  The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions and reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such at the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&Dis") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G. The SEC itself expressly disclaims C&Dis as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on. *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited November 28, 2018).

financial measures.

58.     Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading for the reasons discussed above.  Moreover, while Defendants caution shareholders not to place undue, if any, reliance on the non-GAAP financial forecasts (Proxy 48), the Board itself considered Management Forecasts, which include the non-GAAP measures and GAAP measures and inputs to recommend shareholders to vote in favor of the Proposed Transaction.  *Id*. at 39.  As such, Management Forecasts are clearly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

59.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on pages 48-49, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

60.     In sum, the Proxy independently violates: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial measure to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from ESI shareholders.

61.     Absent disclosure of the foregoing material information prior to the special shareholder meeting, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act
and 17 C.F.R. § 244.100 Promulgated Thereunder)**

62.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

63.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [P]roxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

64.     As set forth above, the Proxy omits material information required by SEC Regulation G, 17 C.F.R. § 244.100, which therefore constitutes an independent violation of Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

65.     The failure to reconcile the numerous material non-GAAP financial measures included in the Proxy is a violation of Regulation G and constitutes a violation of Section 14(a).

66.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast informed votes if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

67.     Plaintiff and the Class have no adequate remedy at law.  Only through the

exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

68.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

69.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in Proxy communications that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

70.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).  The SEC's official public position is to enforce Regulation G in merger transactions by compelling target companies to amend solicitation material including proxies to comply with Regulation G.

71.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

72.     In so doing, Defendants made untrue statements of fact and/or omitted material

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

73.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

74.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

75.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

76.    ESI is also deemed negligent as a result of the Individual Defendants' negligence

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

in preparing and reviewing the Proxy.

77.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

78.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

<u>COUNT III</u>

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

79.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

80.     The Individual Defendants acted as controlling persons of ESI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of ESI, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

81.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

82.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing the Proxy.

83.     In addition, as described herein and set forth at length in the Proxy, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

84.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

85.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

86.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated:  November 29, 2018

                                     Respectfully submitted,

**OF COUNSEL:**                      ROSS LAW OFFICE

**FARUQI & FARUQI, LLP**         By:  _/s/ Michael J. Ross_____
                                       Michael J. Ross
Nadeem Faruqi                    9999 SW Wilshire St, Suite 101
James M. Wilson, Jr.            Portland, Oregon  97225
685 Third Ave., 26th Fl.        Telephone: (503) 222-7915
New York, NY 10017            Email: ross.attorney@gmail.com
Telephone: (212) 983-9330
Email: nfaruqi@faruqilaw.com
Email: jwilson@faruqilaw.com      _Counsel for Plaintiff_

_Counsel for Plaintiff_

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934